## 11206

### J. B. COLT CO. v. FREEMAN

#### (117 S. E., 351)

EVIDENCE—ORAL EVIDENCE HELD NOT ADMISSIBLE TO VARY TERMS OF WRITTEN CONTRACT.—In an action for breach of a sales contract, containing a provision that the writing embraced all the terms of the contract, oral evidence of the purchaser as to his understanding as to the agreement is inadmissible, in absence of proof of fraud.

Before SEASE, J., McCormick, 1922.   Appeal dismissed.

Action by J. B. Colt Co. against John R. Freeman. Judgment for plaintiff and defendant appeals.

Defendant testified that plaintiff's agent stated to him:

" 'I will install this plant and put it in to you for $267.45' ; and I said, 'Will you put that in?'   I said, 'Is that all to it?' and he said, 'That is every cent it will cost you.'   I said, 'I have enough of agents,' and I said, 'If you will guarantee me that you will put that in for $267.45 and no more to it, I will accept it,' and he said, 'Twelve months to pay for it from date of installment with no interest.'   He said, 'We will send a man and notify you when he comes,' and he said, 'He will be coming over to Mr. Chamberlain's and to some others before he gets to you, and he will notify you when he is here and put it up, and all you have to do is to give him your note for $267.45,' and I rpeeated it several times, 'Is that all of it?' and he said, 'That is every cent,' and I called my wife out and he explained it to her, and he said, 'I will put you in an ironing machine,' and my wife said, 'You do to suit yourself,' and I said, 'If that is all to it, go ahead,' and he said, 'Just sign this contract showing that you accept that plant, accept the plant and if it is not accepted to go no further until the plant is put up, and then we will expect your note,' and seemed to be in a hurry.   In fact he never asked me to read it, and he had not made it out before I signed it, and by that time he began to fold it up and put it in his pocket, and he said—I will never forget his words—'You will have to

pay in addition to this $267.45 that I would have to pay for the installment,' I will not say the word I used, but I said, 'If I had known that I would never have given you my order as I am done with agents,' and he hurried off and before he closed it, he said I had 30 days in which to cancel it, and I came to McCormick and wrote to the company to cancel it, that is just the way it was.

"Q. Did he tell you what the contract was? A. He told me that the contract was to show that I agreed to take that plant when it came and give them my note for the money is what he told me.

"Q. Did they ship that plant to you? A. Yes, sir; it was shipped to McCormick.

"Q. Was it installed? A. No, sir.

"Q. Did they ever come to install it? A. No, sir.

"Q. Did you ever take it out of the depot? A. No, sir.

"Q. You never did get the plant? A. No, sir.

"Q. You did not read that contract before you signed it? A. No, sir; I was in a hurry and he was in a hurry.

"Q. By reason of being out of the plant, have you been damaged by reason of not having lights? A. Yes, sir; I had the money at that time.

"Q. And you were ready to pay for it all the time and would have taken it at time? A. Yes, sir; if they had come across."

Defendant testified on cross-examination:

"He came to sell me a plant. He told me that was what he wanted to do. I was dealing at arm's length when I was trading with him. There was no trust relation between us. I was dealing with him as I would any one else from whom I would buy. He was not a friend of mine at all. He told me that it was not his to do it, but he would make this arrangement with me. I decided that it was that he was doing something that he was not allowed to do. He said he was not always allowed to do certain things. I do not know whether he had reference to the company or what he had

been doing with different people. He kinder lead me to be-lieve that it was a different trade from what he made most people. I signed the contract. He presented it to me after the trade was made and said, 'See here, you are in a hurry, and I can fill it out afterwards,' and left. As far as my memory serves me, it was a printed contract. That must be the contract; that is my signature. That is my signature, but it was not filled out when I signed it. I signed it in blank. The truth of the business is I was in a hurry and left. I did not read it, and he did not read it. I trusted it to his honor. I can read. I have not had very much busi-ness experience. I own a little land. I have had to make real estate deals once in a while. There are plenty of people in McCormick County that I trust to their honor and never read the contracts. Very few contracts I do read. The reason I did not pay for this thing was that they agreed to put it in for me. They said they would install it. If he had carried out his contract, I would have had no kick com-ing. For what he told me I would have been satisfied if he had put it in without additional charges. I first made up my mind that that was my defense when he told me, 'I will have to be frank with you, you will have to pay for install-ing it,' and I said, 'That is not my machine and I do not want it.' I wrote the company. The gentleman said it would be about 30 days before he would send the order in, and when the company wrote me they had received my order that I had a right to countermand the order, and I wrote them to countermand the order; that the agent had fallen down on his order before he left my home, that is what I wrote them. When they first demanded that I take it out of the station, I found other reasons. This gentleman forfeited his trade to start with before he left my home, when he filled that out, he said, 'You will have to pay for installing it,' and I said, 'Do not ship it.' I asked for a copy of the contract, and he would not even give me a copy. I did not write to the company at once. I had no idea he

would fill it out and mail it in; he said he would give me 30 days. I never could find out any thing about his business, and I went to others where they bought like I did and they could not tell me any thing. I did not back out'of this trade because I got sick of it when this thing first 'came here; I did not write to the company or get some one else, to write to them saying my reason for not taking it was that I heard the plants were not satisfactory. I did not make that as my reason. I got Mr. Murray, my attorney, to write the Colt Company, stating the gentleman fell down in his trade. I had this letter written by Mr. Murray to the company. I first made up my mind that this installing contract was my defense as soon as he left my home. I wrote to the company before suit was brought. When I got an answer I gave it to Mr. Murray. I had no knowledge of any one who knew anything about installing it; on the other hand, it was his contract to send some one to install it for me—that was his agreement. I was not in correspondence with a man in Augusta who could install it. I did not ask Mr. Murray to write to a man in Augusta. I did not write a letter to J. L. Mitchell at North Augusta. I do not remember anything from Mr. Mitchell at all. As soon as I found he had broken over was when I got sick—when I found the agent had backed out. I suppose I could have read that contract, but I trusted to his honor. I admit I was pretty careless in not doing it. I will not fool with any more agents. I had fooled with agents before was why I was scared of him. I did not read that contract. I admit I was pretty careless in not doing it."

Redirect examination of defendant:

"Q. Mr. Ross has tried to lead you off. Now bring it out clear so the jury will understand it; you testified that you all made the trade before you signed the contract? A. Yes, sir; that is when it was made.

"Q. And your understanding about that contract, as you have testified, before the contract was signed that the plant

was to be shipped to you and installed for $267.45? A. Yes, sir.

"Q. And after this man had induced you to sign the contract, he told you he would be frank with you and that you would have to pay for the installing extra? A. Yes, sir.

"Q. I understood you to tell Mr. Ross that when this man started away you asked him to give you a copy of the contract? A. Yes, sir; he promised to give it as he started off; he did not give it to me because I kicked on the ground that I had to pay for installing it, and I said I would not do it.

"The Court: How about the $24, how did you find out that $24 was to be the cost of installing it? A. He did not say whether it would be $24 or $25; he said it will not be over $24 or $25, but you will have to pay that in addition to the $267.45, and then we parted right there.

"Q. As soon as he told you the cost of installing it would be additional, you told him it was no contract? A. Yes, sir; and I told him not to consider the order.

"Q. You asked him to give you the contract back and he refused? A. Yes, sir; he refused.

"Q. Did you know this man? A. No, sir.

"Q. Had you seen him before? A. No, sir.

"Q. Did you know anything about the company? A. No, sir; I did not know anything about it; I just took him in on what Mr. Chamberlain said.

"Q. As soon as you inquired around and found out where the company was, you wrote them and told them not to ship it? A. Yes, sir; I did.

"By Mr. Ross: That is my signature to that contract. It was not filled out when I signed it. All of this is not my writing. I did not fill it out; I did not do anything but sign my name. I did not write it. I did not sign it but once; it is not my writing. I wrote that down here; I did not write that on the back. It was his pencil. Nothing was said about the $24 until after I had signed the contract. You did not understand me; I did not promise him. I claim

he defrauded me; that is my allegation of fraud. He told me that this $24 would be in addition to the $267.45. He did not tell me that until it was signed. I told him I arranged to pay $267.45, and after he mentioned the $24 or $25 in addition, is what I told Mr. Murray."

At the close of the testimony the plaintiff's counsel made the following motion:

"Mr. Ross: We renew our motion to strike out all of the testimony of this witness with reference to what the contract was between him and the Colt Compnay. On the theory that this witness might be able to show that he was defrauded in signing the contract and under certain allegations in his answer, he was allowed to go on and testify, and his testimony is entirely inconsistent with the allegations.

"The Court: I will hear this motion along with and in connection with a motion to direct a verdict.

"Mr. Ross: We move for a directed verdict for the plaintiff on the ground: (1) That there is no evidence to go to the jury to show that there was fraud which induced him to sign the contract. (2) That there is no proper evidence, except the contract, and the written contract constitutes the sole agreement between the parties.

"The Court: The motion to strike out the testimony is granted on the well-founded principle that you cannot introduce parol testimony to vary the terms of a written instrument, and in this agreement the defendant said—and this is his declaration: 'This order shall become a contract between the purchaser and the company upon acceptance thereof in the space below by one of the officers of said company; it being understood that this instrument, upon such acceptance, covers all the agreements between the purchaser and the company, and that no agent or representative of the company has made any statements or verbal agreements modifying or adding to the terms and conditions herein set forth.' That is what he signed. Now, in the law, people must read their contracts, and he says he did not read it.

The law says he must do it.  If he cannot read, he must try to find some one to read it for him.  Our Courts are not here to act as guardians for people; they must sign their own contracts and have sense enough to know what they are entering into.  They cannot come into Court and say, 'I have heard about the plant and do not want it.'  We cannot have that kind of a law.  The testimony is ruled out, except for the purpose of reforming this contract, and I hold, as Chancellor, that there is not sufficient testimony for a Court of equity to reform the contract, and the contract remains like it is, and it is so ordered.  Therefore, the only thing for me to do is to direct a verdict for the plaintiff in the sum of $267.45.  Write out the verdict.  The testimony clearly shows that was not the reason he wanted to get out of the contract, because he alleges in his answer that he refused to take the plant because it was a much higher price than he had agreed to pay, and he only claims that was $24, and that is not much higher price, and he does not state in his answer what he was to pay.  He made investigations and found that the plant was not giving satisfactory results in other places that it ought to give; yet he was willing to take it at the price he agreed to pay if it proved satisfactory.  He does not claim this one proved unsatisfactory.  Upon the whole case I see nothing for the jury.  Write a verdict for the plaintiff as directed."

### Exceptions

1.  Because his Honor, the presiding Judge, erred in ruling out defendant's testimony and directing a verdict for the plaintiff; the error being that the testimony of the defendant was susceptible of more than one inference.

2.  Because his Honor, the presiding Judge, erred in holding defendant's testimony tended to vary the terms of a written contract; the error being that the testimony of defendant showed fraud in the inception of the contract.

3. Because his Honor, the presiding Judge, erred in refusing defendant's motion for a new trial, for the reasons incorporated in said motion; the error being that the evidence of the defendant tended to prove fraud in the inception, of the contract and not a variation of the terms of the contract, and, in refusing said motion, the presiding Judge abused his discretion and committed prejudicial error.

*Messrs. Joseph Murray* and *F. A. Wise,* for appellant, cite: *Error to strike out testimony and direct verdict for plaintiff:* 73 S. C., 48; 99 S. C., 187; 113 S. E., 490. *Fraud vitiates contract:* 100 S. C., 203; 118 S. C., 368; 96 S. C., 72.

*Messrs. Ross & Owens,* for respondents, cite: *Admission of testimony as to fraud in discretion of Court:* 113 S. C., 317; 110 S. E., 402. *Party who did not use reasonable means to protect himself cannot complain:* 9 S. C., 35; 69 S. C., 87; 8 A. & E. Enc. L., 643.

April 30, 1923.

The opinion of the Court was delivered by Mr. Chief Justice Gary.

The appellant has failed to satisfy this Court that his Honor the Circuit Judge erroneously exercised his discretion, and likewise, for the reasons stated by him, the appeal is dismissed.

Messrs. Justices Watts and Marion concur.

Mr. Justice Cothran (dissenting): Action upon an alleged written contract for the sale of a gaslighting outfit, to recover the price thereof, the plaintiff alleging delivery in accordance with the contract and nonpayment by the defendant upon demand.

The plaintiff alleges, and the defendant admits, the execution of a written order for the outfit, its acceptance by the plaintiff, and the shipment of the goods. As a defense, the defendant alleges in a most indefinite manner that the order

was obtained by fraud and that it failed to include certain importance and essential stipulations and conditions. No specification is made of the facts constituting the alleged fraud nor of the alleged omissions. The answer also sets up a counterclaim for damages and prays judgment for a reformation of the contract by inserting the omitted stipulations and conditions and upon the counterclaim.

No motion was made by the plaintiff to require the answer to be made more definite and certain.

Without objection from the plaintiff upon any other ground than that the oral testimony of the defendant tended to change the terms of the written contract, he was allowed to testify, in substance, that the trade beween him and the plaintiff's agent was that he would pay a certain price for the outfit installed in his home; that relying upon the good faith of the agent he signed the order in blank; that, as soon as the agent got possession of the signed paper, he told him that the latter would have to pay, in addition to the price named, the cost of the installation, some $24 or $25; that the defendant immediately demanded a return of the paper and told the agent in effect that the order was canceled; that the agent refused to give him even a copy of the order, put it in his pocket, and sent it in to the company after having filled in the blanks. Upon a motion by the plaintiff for a directed verdict, the Circuit Judge struck out all of the testimony of the defendant as above outlined, refused to reform the contract, and directed a verdict for the full amound claimed in favor of the plaintiff.

While the defendant's answer is exceedingly imperfect, no objection thereto was made by the plaintiff. The charges of fraud and the grounds of reformation being in the most general terms, in the absence of any objection on the part of the plaintiff and of a motion to make the same more definite and certain, the matter must be considered as if the grounds testified to were specifically set up in the answer.

I think in this situation there was enough evidence of fraud and of the right to a reformation to render the evidence admissible and to require the Circuit Judge to pass upon the equitable defense of reformation.

In my opinion the judgment should be reversed, and the case remanded for a new trial, with leave to the defendant to make his answer more definite and certain as indicated herein, and to set up the defense of rescission of the contract.

MR. JUSTICE FRASER concurs.